## AFFIDAVIT

I, Michelle C. Delpha, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent with the Federal Bureau of Investigation (FBI) in the Rutland, Vermont resident office. I have been so employed for nineteen years. During that time, I have participated in multiple investigations involving a wide array of criminal offenses, including violent crimes. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of and to make arrests for offenses involving violent crimes and sex trafficking. I am also empowered to participate in investigations involving the distribution of controlled substances. With respect to the instant investigation, I have been working with the Northern Vermont Drug Task Force.

2.      This affidavit is submitted in support of a criminal complaint charging Ian JASMIN with conspiracy to distribute cocaine, a Schedule II controlled substance, from in or about June 2014 through in or about February 2015 in violation of 21 U.S.C. §§ 846 and 841(a)(1).

3.      This case has been investigated by me, along with detectives of the Northern Vermont Drug Task Force (VTDTF). I make this affidavit based upon the information provided to me by Detectives of the VTDTF, both verbally and by way of written reports, as well as my participation in the investigation. Since this affidavit is being submitted for the limited purpose of supporting the criminal complaint, I have not included details of every aspect of the investigation. Indeed, there are other aspects of the ongoing investigation that have not been reported here.

1

## PROBABLE CAUSE

4.    In March 2014, I was assigned to investigate a possible violation of human trafficking involving a female juvenile from Vermont. During the investigation, I learned that a black male who went by the nicknames of "Flee" and "Jon-Jon" had taken the female juvenile to New York for purposes of prostituting her for profit. I also learned that "Flee/Jon-Jon" was known to sell heroin, cocaine and crack in the Burlington, Vermont area, including other Vermont towns in Chittenden County.

5.    On October 31, 2014, I, along with VSP Trooper Matt Daley, spoke with a Vermont State Police cooperating individual (CI) who I had been told knew "Jon-Jon." This CI has participated in controlled buys in this case and others. The CI's criminal history includes four felony convictions (marijuana possession, marijuana sale, escape, aggravated assault) and ten misdemeanor convictions (unlawful sheltering, domestic assault, simple assault, two careless or negligent operation of vehicle, attempt to elude law enforcement officer in a vehicle, marijuana possession, leaving the scene of an accident, hindering arrest). According to the CI, the CI was hanging around "Jon-Jon" in early 2014 and was around "Jon-Jon" a lot. Jon-Jon sold heroin, cocaine and crack cocaine, and CI bought heroin from "Jon-Jon" in early 2014. Jon-Jon always carried a 9mm gun on him. The CI did not know Jon-Jon's true identity but told me that he/she follows Jon-Jon's Instagram account. Using his/her cell phone, the CI accessed the account and showed me a photo of Jon-Jon. Using his cell phone, Trooper Daley took a photo of "Jon-Jon" from the Instagram account accessed by the CI. According to the CI, Jon-Jon recently got out of jail relating to charges of simple assault from late 2013 time frame and charges relating to an attempt to steal a police cruiser from several months ago. The CI also told me that

2

Jon-Jon's girlfriend's name was "Laney" and that Jon-Jon had recently contacted the CI using phone number 802-373-3528.

6. On October 31, 2014, Trooper Daley located a police report for an incident which involved an attempted theft of a VSP cruiser, as well as other offenses. Trooper Daley also obtained an arrest photo of the individual who was arrested for the attempted theft of the police cruiser. Trooper Daley provided me a copy of the arrest photo. I reviewed the arrest photo and noted that the individual depicted in it appeared to be the same individual I had seen in the photo of "Jon-Jon" on the Instagram account in the CI's phone earlier that day. Trooper Daley provided me the identity of the individual depicted in the arrest photo: Ian JASMIN, a 30 year-old black male.

7. On November 3, 2014, I met with the juvenile female victim of the human trafficking investigation and showed her a photo array which included a photo of Ian JASMIN. The juvenile victim female identified Ian JASMIN as the person she knew as "Flee" and told me she was certain it was him.

8. I reviewed police reports and other documents relating to Ian JASMIN's arrests in Vermont and learned JASMIN had been in Vermont jails, for those offenses, from about May 1, 2014 until September 15, 2014. I then requested and obtained Ian JASMIN's recorded jail calls from the Vermont Department of Corrections for this time period.

9. Upon receiving copies of the recorded jail calls and other documentation related to the calls, I learned that there were over a 1,100 calls made by JASMIN from jail during this time period and that it cost JASMIN over $1,700 to make these calls. To date, I have listened to over 350 of the calls from the time frame of June 4, 2014 through June 18, 2014, a two-week period. Based upon what I have heard during the phone calls I have listened to so far, I believe

3

that JASMIN, while in the custody of the Vermont Department of Corrections, was conspiring with Delilah NECRASON, to bring controlled substances from New York to the Burlington, Vermont area, for the purpose of selling them. I learned the following information during my review of the phone calls so far:

a.      NECRASON identified herself as Delilah NECRASON during the phone calls between herself and JASMIN. NECRASON also provided her DOB and her parents' address to JASMIN during the calls.  NECRASON and JASMIN also refer to NECRASON as "Laney" during these calls.

b.      During the two-week period of the calls I have listened to, NECRASON traveled to New York City on three different occasions for the purpose of picking up controlled substances from JASMIN's source of the controlled substances. The three trips occurred on or about June 5, 2014, June 9, 2014 and June 17, 2014. Each of these trips were made by NECRASON at the instruction and direction of JASMIN.

c.      JASMIN's source of the controlled substances in New York City is a male who JASMIN refers to as "B-Way" or "Broadway" during the phone calls.

d.      Prior to NECRASON's trips to the city, or while she is en route, JASMIN will ask NECRASON "how much" she has. After getting a figure from NECRASON, JASMIN will instruct NECRASON how much of the controlled substances to purchase from "B-Way." JASMIN refers to the amounts of controlled substances as "blocks" of either "uptown" or "downtown." I have spoken with other FBI agents and detectives of the VTDTF who conduct drug investigations and learned that these are terms that are known to be used by individuals who distribute controlled substances for the purpose of concealing the amount and particular controlled substance they are requesting. For

4

example, on 06/05/2014, during a phone call between JASMIN and NECRASON (which was placed at approximately 07:39 AM), NECRASON placed a 3-way call to "B-Way" during which JASMIN spoke with "B-Way." During this phone call, JASMIN told "B-Way" that NECRASON was "in Manhattan, on Amsterdam, between 62nd and 63rd." JASMIN further tells "B-Way" that NECRASON has "670" not "800" and then tells "B-Way" "10 blocks up from Manhattan" and "5 blocks down from the Bronx."

e.      It appears from the phone calls that NECRASON would also contact "B-Way" directly to arrange the transactions after JASMIN would instruct her what to purchase from him.

f.      After NECRASON returned to Vermont from these three trips, I heard discussions between JASMIN and NECRASON regarding how much money NECRASON had made as of the time of the phone call and how much product remained. For example, during a phone call on 06/06/2014 (which was placed at approximately 7:17 PM), JASMIN asks NECRASON how many "rabbits" she has left. I have been told from FBI agents and detectives who conduct drug investigations that "rabbits" is a term used by individuals who distribute controlled substances to conceal that they are speaking about an amount and/or particular type of a controlled substance. During the call, JASMIN instructs NECRASON to pull her vehicle over to the side of the road and count. NECRASON counts and tells JASMIN "11 ½ and 500." It is believed that "500" referred to the amount of money NECRASON had on her.

g.      In a phone call between JASMIN and NECRASON on June 6, 2014 (placed at approximately 7:43 PM), which was a day after she returned to Vermont after her trip to New York City, NECRASON told JASMIN, "I'm seeing Dave again."

JASMIN replied, "You're not supposed to be seeing people yourself. You're supposed to sit in one spot." JASMIN then tells NECRASON that if the police get her car "...they will get everything."

10.    I reviewed a report written by Detective Matthew Plunkett, of the VTDTF, and learned that on December 18, 2014, the above-referenced CI told Detective Plunkett that JASMIN currently had powdered cocaine for sale and that he would sell four packages for $100.00. On the same date, the CI placed a recorded call to JASMIN to order the cocaine. The CI told Detective Plunkett that the phone number being used by JASMIN was 802-373-3528, the same number it had provided previously. The CI called JASMIN and spoke with him by phone using that number. During the call, JASMIN agreed to meet with the CI. Later that day, the VTDTF used the CI to make a controlled purchase from JASMIN. Prior to meeting with JASMIN, the CI was searched for contraband, large sums of money, or weapons, and none was found. The CI was provided with a recording device, which records audio and video. Detective Plunkett reviewed the recording afterwards and documented the controlled buy in his report. The CI was observed by law enforcement arriving at the designated meet location. According to the audio recording, the CI had contact with no one prior to speaking with JASMIN. Upon exiting the meet location, the CI met law enforcement at a designated location nearby and turned over small packages of a white powder, which was field tested and tested presumptively positive for the presence of cocaine. The cocaine weighed 1.2 grams with packaging. After the transaction, the CI told members of the VTDTF that it met with JASMIN in a vehicle driven by an unknown male. The CI provided the money to JASMIN and JASMIN provided the CI with the four small packages of cocaine.

11.    I reviewed a report written by Detective Matthew Plunkett, of the VTDTF, and learned that on January 14, 2015, the CI told Detective Plunkett that JASMIN had just returned to Vermont and should have drugs for sale. Later that day, the CI placed a recorded call to JASMIN, to phone number 802-373-3528, to order the cocaine. During the call, the CI asked JASMIN what he had available. JASMIN asked the CI what it wanted. The CI asked for $100 worth of cocaine. JASMIN agreed to meet with the CI later that day.  That same day, the VTDTF made a controlled purchase of cocaine from JASMIN using the same procedures described above.  The CI met with JASMIN and paid him $100. JASMIN gave the CI a small package of white powder and an additional small chunk of a white substance. This transaction was monitored and controlled by members of the VTDTF.  Some of the suspected cocaine was field tested using a NIK field test kit and tested positive for cocaine. The cocaine weighed .76 grams with packaging. After the transaction, the CI told members of the VTDTF that it met with JASMIN in the backseat of a vehicle with two unknown white males in the front seats of the vehicle. The CI provided the money to JASMIN and JASMIN provided the CI with the cocaine.

12.    I reviewed a report written by Senior Investigator John Vandermolne, of the New York State Police (NYSP), and learned that on January 17, 2015, Ian JASMIN was arrested in Clarkstown, New York, by the NYSP for charges relating to possession of a controlled substance, use of drug paraphernalia, impersonation and for an outstanding parole violation warrant. The impersonation charge pertained to JASMIN providing a false name and DOB to the NYSP at the time of his arrest. JASMIN's true identity was determined during the NYSP's arrest processing of JASMIN (fingerprint scanning). The scanning of JASMIN's fingerprints provided the NYSP with JASMIN's true identity and criminal history. The false identity JASMIN

provided to NYSP was "Justin Cellis," DOB 3/16/1989. JASMIN is currently in custody at the Rockland County Correctional Facility in New York.

11.     On February 12, 2015, and again on February 17, 2015, I spoke with Detective Jeff Beerworth, of the Burlington Police Department (BPD), who had advised me that on January 12, 2015, five days prior to JASMIN's arrest by the NYSP, it is believed JASMIN was with Delilah NECRASON during a stop of Delilah NECRASON's vehicle, further described as a silver-colored Honda Civic, with Vermont license plate FLE908, by an officer of the BPD, for a traffic violation. The officer identified the driver of the vehicle as Delilah NECRASON. The passenger of the vehicle was a black male who verbally provided the officer the name "Justin Cellis" and DOB 03/16/1989. This was the same alias name and DOB JASMIN used at the time of his arrest by the NYSP on January 17, 2015. The silver-colored Honda Civic is registered to Adam NECRASON, Delilah's father. This is the same vehicle that Delilah NECRASON is stopped in by law enforcement on February 15, 2015, at which time she is carrying twenty grams of a substance that tested positive for the presence of cocaine as described more fully below.

12.     I have read reports written by Detective Plunkett and Detective Sergeant Karl Gardner, both of the VTDTF, and learned the following. On February 15, 2015, Detectives Plunkett and Gardner received information that a Correctional Officer of the Rockland County Correctional Facility, in New York, who had been monitoring JASMIN's non-privileged phone calls, overheard a phone call between JASMIN and his girlfriend (who was known by members of the VTDTF to be Delilah NECRASON), during which NECRASON told JASMIN that she was in possession of controlled substances, was heading home and was about an hour north of Brattleboro, Vermont. The VTDTF knew NECRASON to be from the Burlington, Vermont area. It was believed, based upon the phone call, that NECRASON would have controlled substances

8

in her possession. Based upon information the VTDTF had previously received from the Burlington Police Department regarding NECRASON, it was believed that NECRASON would be traveling in a silver Honda Civic bearing VT registration FLE908.

13. While monitoring northbound traffic from the Waterbury rest area, at approximately 6:55 p.m., Detective Sergeant Karl Gardner of the VTDTF observed a silver vehicle that appeared to be a Honda Civic with Vermont registration FLE908. Detective Sergeant Gardner observed that the vehicle was being driven by a female. Detective Sergeant Gardner followed the vehicle North on I-89 in the direction of Burlington. As they approached exit 12 (Williston), Detective Sergeant Gardner observed a traffic violation committed by the operator of the vehicle. The traffic violation information was relayed to an Officer of the South Burlington Police Department who subsequently stopped the vehicle on Route 2A, in the vicinity of the Chili's Restaurant. The officer identified the operator of the vehicle as Delilah NECRASON. During the traffic stop, NECRASON provided the officer consent to search the vehicle. Officers searched the vehicle and did not locate any contraband inside the vehicle. Detective Sergeant Gardner and Detective Matthew Plunkett then spoke with NECRASON. While speaking with the detectives, NECRASON voluntarily provided Detective Plunkett with approximately twenty grams of white powder that she had hidden in her pants. The white powder was field tested using a NIK field test kit and tested positive for cocaine. NECRASON also told the detectives that her boyfriend was Ian JASMIN and that she was returning from a trip during which she visited JASMIN at the Rockland County Correctional Facility, in New York, for Valentine's Day (the previous day).

14. After the cocaine was located, NECRASON provided consent for the detectives to bring her vehicle to the VSP's Williston barracks so that they could conduct a more thorough

9

search. During the search of the vehicle, Detective Sergeant Gardner located a roll of money which contained 100's, 50's and 20 dollar bills. Detective Sergeant Gardner found this to be odd due to the fact that NECRASON claimed to have no money during his earlier interaction with her. Detective Sergeant Gardner recorded the serial numbers and took photos of the money, and then returned the money back into the purse which was inside the vehicle. Detective Sergeant Gardner also photographed a US mail receipt of a package that NECRASON had sent to Ian JASMIN at the Rockland County Correctional Facility, in New York.

15. On February 27, 2015, I listened to a monitored and recorded jail call that the Burlington Police Department received from the Rockland County Correctional Facility in New York, where JASMIN is in jail. This telephone call took place on or about February 16, 2015. JASMIN used another inmate's pin number to make the call. As I listened to the call, I recognized the inmate's voice as Ian JASMIN. I also recognized Delilah NECRASON's voice as the other participant. Furthermore, during the course of the recorded phone call, JASMIN referred to the female as "Delilah NECRASON." During the course of this phone call, the two refer to the traffic stop the day before. JASMIN chastises NECRASON for not having body-packed the drugs. NECRASON replies that she usually does and this was the one time she had not body-packed. During this conversation, JASMIN also tells NECRASON "you still have more bread to get."

16. On February 27, 2015, I listened to a second monitored and recorded jail call that the Burlington Police Department received from the Rockland County Correctional Facility in New York. This telephone call took place on or about February 16, 2015. JASMIN again used another inmate's pin number to make a call. I recognized the inmate's voice as Ian JASMIN. I also recognized Delilah NECRASON's voice, and during the telephone call, JASMIN referred to

10

the female as "Delilah." They again talk about the traffic stop. JASMIN tells NECRASON "they want heroin; you got caught with coke." JASMIN asked NECRASON, "How much bread you got?" and NECRASON replied, "8." JASMIN directs NECRASON to wire the money to "Sierra." JASMIN explains that they can always lie as to how they made the bread. He also tells NECRASON that she has got to figure out a way to make more bread and that he has to get "Sierra" the bread in the morning. JASMIN also tells NECRASON not to use her own name when she sends the wire transfer.

17.     On February 27, 2015, I read a report written by Detective Plunkett stating that on February 20, 2015, he observed Delilah NECRASON travel from her parents' home in Jericho, Vermont to Kinney Drugs at 81 Pearl Street in Essex. Detective Plunkett observed NECRASON enter Kinney Drugs. At Detective Plunkett's request, the Essex Police Department went to Kinney Drugs and learned that at the time Detective Plunkett observed NECRASON at Kinney Drugs, someone using the name "Taylor Smith" was at Kinney Drugs and wired money via Western Union to "Ciera Norfleet" of New York. According to his report, Detective Plunkett later viewed the surveillance video from Kinney Drugs and determined that it was NECRASON who sent the Western Union money order to "Ciera." I know from talking with the VTDTF and other drug investigators, that sending money via Western Union is a common technique used by drug traffickers to send drug proceeds.

11

## CONCLUSION

19.    Based on the above information, I believe that there is probable cause to charge

Ian JASMIN with conspiracy to distribute cocaine, a Schedule II controlled substance, from in or

about June 2014 through in or about February 2015 in violation of 21 U.S.C. §§ 841 and 846.

Sworn to under the pains and penalties of perjury,

Michelle Delpha
Special Agent
Federal Bureau of Investigations

SUBSCRIBED and SWORN before me on March 2 , 2015.

HONORABLE JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE

12